REL: 02/28/2014
REL: 08/29/2014 (as modified on denial of rehearing)

Notice: This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**.  Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0649), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

OCTOBER TERM, 2013-2014

———————————————

1110588

———————————————

**Ex parte STV One Nineteen Senior Living, LLC, d/b/a Somerby at St. Vincent's One Nineteen**

PETITION FOR WRIT OF CERTIORARI
TO THE COURT OF CIVIL APPEALS

(In re:  Daniel Senior Living of Inverness I, LLC, d/b/a Danberry at Inverness

v.

STV One Nineteen Senior Living, LLC, d/b/a Somerby at St. Vincent's One Nineteen; State Health Planning and Development Agency; and Certificate of Need Review Board)

(Montgomery Circuit Court, CV-10-901242;
Court of Civil Appeals, 2100476)

1110588

MURDOCK, Justice.

Daniel Senior Living of Inverness I, LLC, d/b/a Danberry at Inverness ("Danberry") successfully appealed to the Court of Civil Appeals from a decision of the Montgomery Circuit Court affirming the issuance by the State Health Planning and Development Agency ("SHPDA") of a certificate of need to STV One Nineteen Senior Living, LLC, d/b/a Somerby at St. Vincent's One Nineteen ("Somerby") on an "emergency" basis. Daniel Sr. Living of Inverness I, LLC v. STV One Nineteen Sr. Living, LLC, [Ms. 2100476, Feb. 3, 2012] ___ So. 3d ___ (Ala. Civ. App. 2012). This Court granted Somerby's petition for certiorari review of the decision of the Court of Civil Appeals. We now affirm that decision.

## I. Legal and Factual Background

### A. The CON-Review Process Generally

The Alabama Legislature has enacted a statutory scheme to provide for "health care services and facilities found to be in the public interest." Section 22-21-261, Ala. Code 1975, states:

> "The Legislature of the State of Alabama declares that it is the public policy of the State of Alabama that a certificate of need program be administered in the state to assure that only those

2

1110588

> health care services and facilities found to be in the public interest shall be offered or developed in the state. It is the purpose of the Legislature in enacting this article to prevent the construction of unnecessary and inappropriate health care facilities through a system of mandatory reviews of new institutional health services, as the same are defined in this article."

To effectuate the aforesaid purpose, the legislature enacted Article 9, "Control and Regulation of Development of Certain Health Care Facilities," of Title 22, Chapter 21, of the Alabama Code, codified at §§ 22-21-260 to 22-21-278, Ala. Code 1975. Article 9 gives the Statewide Health Coordinating Council ("SHCC") (see § 22-4-7 and -8, creating the SHCC) responsibility for preparing and periodically revising the State Health Plan ("SHP"), a comprehensive catalogue of the health-care needs of the State. The SHP "provide[s] for the development of health programs and resources to assure that quality health services will be available and accessible in a manner which assures continuity of care, at reasonable costs, for all residents of the state." Ala. Code 1975, § 22-21-260(13). See Ala. Code 1975, § 22-21-260(13) and (15); Ala. Admin. Code (SHPDA) Rule 410-2-1-.02.

To aid in the administration of the State's health-planning law, the legislature also created SHPDA, a body

3

composed of three consumers, three health-care providers, and three representatives appointed by the governor. Ala. Code 1975, § 22-21-260(14). Under the state-health-planning laws adopted by our legislature, health-care providers must apply to SHPDA for a certificate of need (sometimes referred to herein as a "CON") before offering a new institutional health service, and that service must be consistent with the SHP. Ala. Code 1975, §§ 22-21-263(a), -265(a), and -267; Health Care Auth. of Athens & Limestone Cnty. v. SHCC, 988 So. 2d 574, 578 n.1 (Ala. Civ. App. 2008). Institutional health services subject to the CON-application process include, among many other things, converting long-term-care beds from one category to another. Ala. Code 1975, § 22-21-263(a)(3); Ala. Admin. Code (SHPDA) Rule 410-1-4-.01(1)(c)(3)(v).[1]

In the standard CON-application process, the applicant must file a letter of intent ("LOI") with SHPDA at least 30 days prior to submitting the CON application. Ala. Admin. Code (SHPDA) Rule 410-1-7-.05(1). Upon determining that an application is complete, SHPDA notifies the applicant and

---

[1]The legislature also has tasked SHPDA with promulgating rules and regulations governing regular and emergency CON-application procedures. See, e.g., Ala. Code 1975, §§ 22-21-267, -268, -274, and -275.

"other affected persons," such as competing health-care providers, of the application and the review schedule. Ala. Admin. Code (SHPDA) Rule 410-1-7-.08. A mandatory 90-day "review period" or "review cycle" then begins. Ala. Admin. Code (SHPDA) Rule 410-1-7-.09. The other affected persons then have 45 days to submit opposition, if any, to the application, Ala. Admin. Code (SHPDA) Rule 410-1-7-.13, and 55 days to request a contested-case hearing on the application. Ala. Admin. Code (SHPDA) Rule 410-1-7-.15.

The Certificate of Need Review Board ("the CONRB")[2] is required to hold monthly public hearings to review pending applications. Ala. Admin. Code (SHPDA) Rule 410-1-7-.17. As was done in this case, the CONRB can "batch" applications together into the same review cycle for comparative, competitive consideration; the batched-review cycle takes 180 days. Ala. Admin. Code (SHPDA) Rule 410-1-7-.19.

---

[2]In the health-care-services regulatory scheme, the terms "SHPDA" and "CONRB" are deemed synonymous and are used interchangeably. Ala. Admin. Code (SHPDA) Rule 410-1-2-.01. For ease of understanding, we generally refer to the panel of individuals that holds hearings on CON applications as the CONRB, while using the term SHPDA to refer to the agency in its more general regulatory capacity.

1110588

The CONRB is required to issue a final order granting or denying a CON application within 15 days of the public hearing at which the application was considered.  Ala. Admin. Code (SHPDA) Rule 410-1-8-.07(1)(a).  A party "aggrieved" by a SHPDA decision may submit a request for reconsideration by the CONRB of its decision within 15 days of that decision, but it is not required to request reconsideration before seeking judicial review.  See Ala. Code 1975, § 22-21-275(12); Ala. Admin. Code (SHPDA) Rule 410-1-8-.09(1) and (3).  The aggrieved party also may, but is not required to, request a fair hearing within 15 days of what would otherwise become the CONRB's final decision, with or without first submitting a motion for reconsideration.  Ala. Admin. Code (SHPDA) Rule 410-1-8-.16.

The fair hearing is a de novo review.  Ala. Code 1975, § 22-21-275(14); Ala. Admin. Code (SHPDA) Rule 410-1-8-.22(1).  The record of the hearing before the CONRB is part of the record before the administrative law judge presiding at the fair hearing and is entitled only to "due consideration" by the administrative law judge, who is alternately referred to in the regulations and in SHPDA communications as a fair

6

hearing officer ("FHO").  Id.  The FHO is required to enter a final order containing findings of fact and conclusions of law, Ala. Admin. Code (SHPDA) Rule 410-1-8-.24, and that order "shall be considered the final decision" of SHPDA, § 22-21-275(14), Ala. Code 1975; Ala. Admin. Code (SHPDA) Rule 410-1-8-25.  The FHO's decision can be appealed to, among other circuit courts, the Montgomery Circuit Court.  Ala. Admin. Code (SHPDA) Rule 410-1-8-.24.

The process for filing an emergency CON application is authorized by § 22-21-268, Ala. Code 1975, which provides:

> "Any person may apply, either independently and without notice under Section 22-21-267[3] or as a part of an application filed under Section 22-21-267, for an emergency certificate of need for the authorization of capital expenditures made necessary by unforeseen events which endanger the health and safety of the patients.  Emergency capital expenditures include, but are not necessarily limited to, emergency expenditures to maintain quality care, to overcome failure of fixed equipment, including heating and air conditioning equipment, elevators, electrical transformers and switch gear, sterilization equipment, emergency generators, water supply and other utility connections. Applications for emergency certificates of need shall include a description of the work to be done and/or equipment to be purchased, the cost thereof, justification for considering the capital expenditure as being of an emergency nature and such

---

[3]Section 22-21-267, Ala. Code 1975, concerns the CON-application process.

other information as the SHPDA may require. Emergency certificates of need issued hereunder shall be subject to such special limitations and restrictions as the duration and right of extension or renewal as may be prescribed in the rules and regulations adopted by the SHPDA."

Rule 410-1-10-.01, Ala. Admin. Code (SHPDA), governs the emergency procedure and provides, in pertinent part:

"(1) Any person may apply independently and without notice for an emergency certificate of need for the authorization of capital expenditures made necessary by unforeseen events which endanger the health and safety of the patients. Emergency capital expenditures include, but are not necessarily limited to, emergency expenditures to maintain quality care, overcome failure of fixed equipment, including heating and air conditioning equipment, elevators, electrical transformers, and switch gear, sterilization equipment, emergency generators, water supply and other utility connections and damage caused by natural or manmade disaster.

"(a) The applicant must notify the state agency in writing, describing the nature of the emergency, the probable amount of the emergency expenditure and the anticipated date that the emergency expenditure would be obligated. The applicant must clearly demonstrate that an emergency exists. "

The emergency CON-application procedure avoids the notice requirements and competitive review involved in a standard CON application. As the parties here (and SHPDA in the Court of Civil Appeals) state in their briefs, and as is consistent

with the type of emergency expenditures described above, emergency applications are usually uncontested. Corroborative of this fact is the fact that, prior to this case being appealed to the Court of Civil Appeals, Alabama's appellate courts had never had occasion to discuss either § 22-21-268 or Rule 410-1-10-.01.

### B. Facts and Procedural History

On March 25, 2010, the SHCC, in response to Somerby's request, voted to adjust the SHP to indicate the need for 164 specialty-care assisted-living-facility ("SCALF") beds in Shelby County.[4] SCALF beds are dedicated to housing memory-impaired patients, such as those suffering from dementia. The parties agree that such beds require more specialized personnel and security measures than do assisted-living-facility ("ALF") beds. On March 31, 2010, then Governor Bob Riley approved the adjustment to the SHP.

---

[4]Before the SHCC adjusted it, the SHP had indicated a need for 96 SCALF beds in Shelby County. Evidence submitted to the SHCC revealed, however, that there were actually 128 SCALF beds in service in that county when the adjustment was made. Therefore, the adjustment to the SHP to indicate the need for 164 SCALF beds in Shelby County essentially reflected a need for an additional 36 SCALF beds above the 128 SCALF beds already in service.

After the adjustment to the SHP, both Somerby and Danberry applied for a CON to convert 24 of their existing ALF beds in Shelby County to SCALF beds. However, on May 28, 2010, the same day that Somerby filed its standard CON application, Somerby also applied for an emergency CON to convert 24 of its existing ALF beds in Shelby County to SCALF beds.[5] Thus, Somerby applied for both a standard CON and an emergency CON in an attempt to convert 24 of its ALF beds to SCALF beds.

Danberry opposed Somerby's emergency CON application. On June 16, 2010, the CONRB met to consider Somerby's emergency CON application. The meeting featured live testimony and other evidence and argument supporting and opposing Somerby's emergency application. That same day, the CONRB approved Somerby's application for an emergency CON by a vote of four to one. The CONRB issued a final, written decision granting Somerby the emergency CON on July 1, 2010, slightly more than a month after Somerby had filed its application.

---

[5]Somerby had filed a LOI on March 25, 2010, to submit a standard CON.

On July 8, 2010, Danberry filed a motion for reconsideration, which, because it had been filed only 13 days in advance of the hearing, was not heard at the July 21 CONRB meeting.[6]  See Ala. Admin. Code (SHPDA) Rule 410-1-8-10; Rule 410-1-9-.05.  At the next meeting on August 18, 2010, Danberry stipulated that discussion of the motion was moot because the motion had been denied by operation of law 30 days after it was filed.  See Ala. Code 1975, § 41-22-17(e).  On August 20, 2010, Danberry filed a request for a fair hearing.

The fair hearing was held on September 3, 2010, after which the FHO entered his order.  The FHO concluded that Somerby's emergency CON application was due to be granted, and he provided two alternative grounds for his decision.  First, he concluded that Somerby's rights under its emergency CON had already vested, and that Danberry therefore had lost its right to a fair hearing.  Alternatively, he concluded that Somerby had provided substantial evidence that its emergency CON

---

[6]Somerby in its brief and the FHO in its final order state that Danberry filed its motion for reconsideration on July 8, 13 days before the July 21 hearing.  Danberry states in its appellate brief that it filed the motion on July 7.  Danberry does not contest that its motion, though timely as it related to the CONRB's final decision, was filed too late to be heard at the July 21 meeting.

11

application presented an actual emergency within the meaning of § 22-21-268 and Rule 410-1-10-.01.[7]

Danberry appealed the FHO's order to the Montgomery Circuit Court, pursuant to § 41-22-20, Ala. Code 1975. The circuit court entered a judgment affirming SHPDA's decision to issue Somerby an emergency CON for the 24 SCALF beds. Danberry then appealed to the Court of Civil Appeals. The Court of Civil Appeals reversed the circuit court's decision on the ground that Somerby's application did not present an emergency within the contemplation of the statute and regulation. As noted, Somerby petitioned this Court for certiorari review of the decision of the Court of Civil Appeals.

## II. Standard of Review

Section 41-22-20(k), Ala. Code 1975, states that "[SHPDA's] order shall be taken as prima facie just and reasonable and the [reviewing] court shall not substitute its

---

[7]The FHO addressed the issue whether Somerby's request qualified as an "emergency" under the law because, as his order explained, "this Fair Hearing Officer feels that the prudent action is for him to proceed with a ruling in regard to the Fair Hearing to assist in any way a reviewing Court in the event a reviewing Court determines that the Fair Hearing Officer's Granting of the Motion to Strike and Dismiss was due to be reversed."

judgment for that of [SHPDA] as to the weight of the evidence on questions of fact." Our review of SHPDA's conclusions of law and its application of the law to the facts, however, are de novo. See Ex parte Wilbanks Health Care Servs., Inc., 986 So. 2d 422, 425 (Ala. 2007) (stating, among other things, that the Alabama Medicaid Agency did not have "unfettered discretion" to define the term "maintenance").

### III. Discussion

#### A.

At the outset, we note that Somerby has contended that its CON was fully "vested" prior to Danberry's request for a fair hearing. Somerby asserts that that vesting prevented Danberry from challenging the CON issued by the CONRB. Because Danberry could not challenge the issuance of the CON, Somerby argues, the Court of Civil Appeals could not, in effect, revoke the CON based on a determination that there was not an "emergency."

As a preliminary matter, we note that Somerby contends that Danberry waived any right to challenge the issuance of the CON because it failed to make a substantive argument on the vesting issue to the Court of Civil Appeals. A careful

13

reading of the circuit court's opinion, however, reveals that, although the circuit court apparently believed that the vesting of Somerby's CON had occurred in a manner that truncated the administrative-review process, the circuit court saw nothing in this vesting that affected Danberry's right to judicial review of the issuance of the CON. Clearly, the circuit court conducted that judicial review, noting in the process that Danberry had complied with § 41-22-21(k). Moreover, the circuit court's judgment leaves no doubt that that court did decide the issue of the propriety of the issuance of the CON on its merits.

Appropriately, therefore, Danberry challenged the circuit court's judgment in its brief to the Court of Civil Appeals by challenging the circuit court's decision as to the merits of the CONRB's issuance of an emergency CON. Similarly, the Court of Civil Appeals addressed the circuit court's judgment on that basis. Clearly, the Court of Civil Appeals declined Somerby's invitation to affirm the circuit court's decision on the alternative legal ground that further administrative and, in turn, judicial challenges to the issuance of its CON had been foreclosed by the alleged "vesting" of the CON. Like

SHPDA in its brief to the Court of Civil Appeals, the majority of that court found no reason to discuss the issue. Not even the dissenting opinion seized upon it as a ground for its position. Nonetheless, as it is entitled to do, Somerby tries again in this Court to achieve a discussion of the issue whether "vesting" should serve as an alternative ground for upholding the circuit court's judgment. Unlike the Court of Civil Appeals, we will discuss the issue. We see no waiver of the issue by Danberry.

As to its merits, Somerby's argument regarding the alleged "vesting" of its CON is based on a fundamental misunderstanding of the intent of the applicable statutes and regulations. This misunderstanding is best reviewed within the framework of the procedural history of this case.

On July 1, 2010, the CONRB granted the emergency CON to Somerby. Pursuant to § 22-21-275(12), Danberry then had 15 days to file a request that the CONRB reconsider its decision. The effect of such a request within the time allowed by the statute is made clear by the statute:

> "Request for reconsideration shall be made in writing not more than 15 days subsequent to the date the agency (SHPDA) decision is deemed final and <u>shall have the effect of holding in abeyance the</u>

15

> <u>final decision and suspending any certificate of</u> <u>need issued pursuant thereto, subject to the outcome</u> <u>of the public hearing</u>."

§ 22-21-275(12)(emphasis added). Danberry timely filed its request for reconsideration within the time allowed by the statute, specifically, on July 8, 2010. Therefore, pursuant to the plain language of § 22-21-275(12), the decision of the CONRB, which would otherwise have been final and upon which Somerby otherwise could have acted, was "suspended" subject to the outcome of Danberry's request.

The next meeting of the CONRB following Danberry's filing of its request for reconsideration was on July 21. Under the applicable regulation, the CONRB will not consider a request for reconsideration filed less than 15 days before any given meeting. As a result, the CONRB did not consider Danberry's request for reconsideration at its July 21 meeting and, as a consequence, that request was denied by operation of law on August 7, 30 days after its filing, pursuant to § 41-22-17(e), Ala. Code 1975. With the denial on August 7 by operation of law of Danberry's request for reconsideration, Danberry had the right under the law to request a "fair hearing." Specifically, as was the case following the initial decision

16

by the CONRB, Danberry had 15 days from the denial of its request for reconsideration to request a fair hearing. In language identical to that prescribing the effect of a request for reconsideration to the CONRB, the effect of a timely request for a fair hearing is made clear by the statute:

> "The appeal shall be commenced by a request for a fair hearing by the applicant or any competing applicant, which request shall be made within 15 days of the date that the decision by the state agency became final, or in the event of a request for reconsideration, within 15 days of the date that the decision of the state agency on reconsideration became final <u>and shall have the effect of holding in abeyance the decision and suspending any certificate of need issued pursuant thereto subject to the outcome of the fair hearing</u>."

Ala. Code 1975, § 22-21-275(14) (emphasis added). See also Ala. Admin. Code (SHPDA) Rule 410-1-8-.17 ("The request for fair hearing shall have the effect of holding in abeyance the issuance of the Certificate of Need and suspending any Certificate of Need issued pursuant to SHPDA's decision subject to the outcome of the fair hearing.").

Danberry timely filed its request for a fair hearing within the time allowed by the statute, specifically, on August 20, 2010. Therefore, under the plain language of § 22-21-275(14), the denial by operation of law on August 7 of

Danberry's motion for reconsideration, which otherwise would have made the CONRB's decision final and upon which Somerby otherwise could have proceeded to act as of August 22, 2010, was "suspended" on August 20 as a result of Danberry's timely request for a fair hearing.

Notwithstanding the timely filings by Danberry for reconsideration and a fair hearing within each of the 15-day windows described above, Somerby argues that it, Somerby, took unilateral action during the second of those 15-day windows that deprived Danberry of the right to the completion of the administrative review that Danberry was in the midst of pursuing. Specifically, Somerby contends that, notwithstanding the apparent intent of § 22-21-275(12) and (14), § 22-21-270(d), Ala. Code 1975,[8] contemplates that,

---

[8]Section 22-21-270(d) provides:

"(d) Upon completion of the construction and issuance of a certificate of completion or the receipt of proof of purchase of equipment or inauguration of a new health service, the certificate of need shall be vested in and continued in force and effect as a part of the health care facility and shall survive changes of control and changes of ownership of the health care facility without further certificate of need approval by this agency."

(Emphasis added.)

18

1110588

simply by acting quickly enough following a CONRB decision in its favor, a prevailing CON applicant can unilaterally "cut off" the aggrieved party's rights under those statutes. It is in this regard that Somerby evinces a fundamental misunderstanding of the statutory provisions at issue.

The purpose of § 22-21-270 is to address the duration -- i.e., the "shelf life" -- of a CON. See generally, e.g., Roberts Health Care, Inc. v. SHPDA, 698 So. 2d 106, 107 (Ala. 1997) (citing § 22-21-270 and Ala. Admin. Code (SHPDA) Rule 410-1-11-.01., which largely tracks § 22-21-270(a), for the proposition that a CON generally has a 12-month "duration" and that SHPDA may extend the life of a CON for an additional 12 months based on certain criteria).[9] It is necessary to establish such a "shelf life" for a number of reasons. Most fundamentally, the very purpose for issuing "certificates of need" is to meet "needs" -- existing needs. It was never the intent of the statutory scheme, therefore, for an applicant to be able to obtain a CON on the basis of some purportedly existing need, but then fail to act reasonably promptly on the

---

[9]Accordingly, § 22-21-270 is aptly titled: "Certificates of need -- Period for which valid; extension of time; termination; transferability."

19

issuance of the CON and thereby leave unmet the need for which the CON was issued. Beyond that, the circumstances that justify the issuance of a CON so as to allow an applicant to offer some new service (e.g., population growths and shifts, available technology, the management and ownership of the applicant) are subject to change in the years following the issuance of a CON.

Accordingly, the first sentence of § 22-21-270 states simply that "[a] certificate of need ... shall be <u>valid</u> for a period not to exceed 12 months and may be subject to one extension not to exceed 12 months, provided the criteria for extension as set forth in the rules and regulations of the SHPDA are met." (Emphasis added.) Subsection (a) of § 22-21-270 then goes on to explain that applications for an extension filed under § 22-21-270 shall be accompanied by a new "filing fee." Moreover, it goes on to explain how the 12-month life of a CON is intended to work: "If no obligation has occurred within such [12-month] period, the certificate of need shall be considered terminated and shall be null and void." That is, if the recipient of the CON has not acted upon it within the 12-month period, the CON simply expires of its own accord.

Without such a provision, nothing would prevent a prevailing applicant from "sitting on" a CON for years after its issuance, then attempting to act upon it.

The point of § 22-21-270 is to provide for a natural expiration of a certificate of need if it is not acted upon within some defined period after the administrative decision to issue that certificate has become final, not to override or truncate the process by which that decision becomes final, a process clearly prescribed in other portions of the SHPDA statutes and regulations. All the various provisions of § 22-21-270 bear this out. We have already noted the language of the first sentence of § 22-21-270 describing simply the period during which a CON shall remain "valid." The last sentence of § 22-21-270(a) provides that "[s]hould the obligation [contemplated by the CON] be incurred within [the 12-month period or an extension thereof], the certificate of need shall be continued in effect for a period not to exceed one year or the completion of the construction project, whichever shall be later, or the inauguration of the service or the actual purchase of equipment." Subsection (b) explains that "[f]ailure to commence [a] construction project within the

21

time period stated in [an applicable] construction contract or to complete the construction project within the time period specified in the construction contract, which may be extended by mutual agreement of the parties ..., shall render the certificate of need null and void, unless tolled or extended" pursuant to statute or SHPDA rule or regulation. Moreover, subsection (c) explains that "[a]pplicants who held valid certificates of need which were terminated under this section may file a new application for a certificate pursuant to and subject to the provisions of this article."

It is in the same vein as these other provisions of § 22-21-270 that subsection (d) explains what happens to the "life" of a CON if the provider acts reasonably promptly to begin meeting the needs for which the CON was issued:

> "Upon completion of the construction and issuance of a certificate of completion or the receipt of proof of purchase of equipment or inauguration of a new health service, the certificate of need shall be vested in and continued in force and effect as a part of the health care facility and shall survive changes of control and changes of ownership of the health care facility without further certificate of need approval by this agency."

In other words, while the other subsections of § 22-21-270 largely concern themselves with the consequences of persuading

SHPDA to issue a certificate of need and then <u>not</u> acting upon it, subsection (d) conversely describes the expected and desired course of events: a certificate of need is issued, and, within a reasonably prompt time, the holder of the certificate fulfills its implied promise to provide the new service, acquire the new equipment, or begin construction of the new facility, thereby preventing the certificate from simply expiring from nonuse.[10]

The foregoing finds yet further corroboration in provisions of the law that establish the point at which the "shelf life" of a CON begins to run. Specifically, SHPDA itself (which, again, has not embraced the vesting argument crafted by Somerby), measures that shelf life from the point

---

[10]As noted, one of the factors assessed by SHPDA in deciding whether a CON should be issued to an applicant is the ownership of that applicant. Accordingly, what it means for a CON to "vest" is further explained by subsection (e), which states that "[p]rior to becoming vested under subsection (d), a certificate of need shall not be transferable, assignable, or convertible other than to an entity under common ownership and control."

We also note that, before March 2013, the applicable wording of § 22-21-270(d) provided merely that "[u]pon completion of the construction and issuance of a certificate of completion or the receipt of proof of purchase of equipment, the certificate of need shall be continued in force and effect." See Act No. 2012-294, Ala. Acts 2012.

at which all properly requested administrative reviews are concluded, the administrative decision to issue the CON is final, and the CON is, in turn, "issued." As noted, § 22-21-270 starts with the basic premise that, unless the CON is acted upon, the life of a CON will be 12 months from the date the CON is "issued." Rule 410-1-8-.08 of the Alabama Administrative Code adopted by SHPDA specifically explains when it is that the "issuance" of a CON occurs for purposes of § 22-21-270 and, in so doing, confirms what § 22-21-275(12) and (14) mean by their provisions for the "suspension" of a CON:

> "(1) The executive director of the state agency shall <u>issue</u> a certificate of need to the applicant thirty (30) days <u>after the decision of the Certificate of Need Review Board is deemed final, unless the issuance of the certificate of need is suspended by the filing of a request for reconsideration pursuant to Sections 410-1-8-.14 and 410-1-8-.15, or request for fair hearing under Section 410-1-8-.17</u>. The 30 day period may be waived or extended with the consent of all parties."

(Emphasis added.) In other words, SHPDA itself understands the provisions of § 22-21-270 to provide for a 12-month (or longer if extended) life of a CON that will begin at the point at which any properly requested reconsideration and/or fair hearing is concluded <u>and</u> the CON is actually "issued"

24

thereafter.[11]  Compare, e.g., <u>Bradbury Mem'l Nursing Home v. Tall Pines Manor Assocs.</u>, 485 A.2d 634, 638 (Me. 1984) ("The Certificate of Need Act, 22 M.R.S.A. § 311, gives 'any person aggrieved by a final decision of the department' the right to review in accordance with the Administrative Procedure Act, 5 M.R.S.A. §§ 11001-11008. The Department's decision to issue a CON is not 'considered final until the Department has taken final action on a request for reconsideration under section 310.'").

---

[11]See Ala. Admin. Code (SHPDA) Rule 410-1-11-.01, explaining that a CON is "valid for a period" that runs "from the date of issuance," and also that that period is tolled during the pendency of any judicial review of the decision to issue the CON:

> "A Certificate of Need issued under these rules shall be <u>valid for a period</u> not to exceed twelve (12) months <u>from the date of issuance</u>, and may be subject to one extension not to exceed twelve (12) months, provided the holder of the Certificate of Need applies in writing for the extension and meets the extension criteria set out in Chapter 410-1-11 of these rules and regulations. The running of the duration of the initial twelve (12) month period, or an extension thereof, shall be tolled from the date of the filing of a civil action arising under any of the provisions of Title 22, Chapter 21, Article 9, Code of Ala. 1975, being §§ 22-21-260 through -278, or other judicial proceeding until such action is dismissed from the judicial process."

Not only does the language of the § 22-21-270 itself fail to support Somerby's position, the understanding of § 22-21-270 urged upon this Court by Somerby is in direct conflict with the administrative- and judicial-review processes clearly prescribed in §§ 22-21-275(12) and (14). We cannot conclude that it was the legislature's intent to speak out of "one side of its mouth" in establishing certain rights to administrative and judicial review within clearly prescribed time limits in § 22-21-275 (with no reference to any exceptions created by § 22-21-270), while simultaneously intending to "speak out of the other side of its mouth" in § 22-21-270(d) (without any reference to § 22-21-275) so as to allow one side to a dispute to "rush out" and purchase equipment or sign a construction contract and thereby unilaterally thwart the clearly prescribed administrative procedures and deadlines for due consideration of the merits of an application for a certificate of need.[12]

---

[12]In addition to, and corroborative of, the foregoing, an interpretation of § 22-21-270(d) of the nature urged by Somerby would raise due-process concerns. Somerby insists that, despite Danberry's timely filings, somehow the law prevented Danberry from challenging Somerby's CON. Such a possibility, especially the foreclosure of any judicial review, raises a fundamental due-process problem. Danberry should not be put in the position of having followed the

As noted, Danberry responded at each step of the administrative-review process (and the subsequent judicial-review process) in a timely manner. Somerby does not contend otherwise. Instead, it takes the position that, notwithstanding Danberry's timely compliance with every requirement of the administrative-review process, Somerby's CON "vested" in the midst of that review process in a manner that should be understood to "cut off" the continuation and fulfillment of that process and, as a result, also "cut off" the right to judicial review. In effect, Somerby takes the position that its CON vested before Danberry had an opportunity to challenge it. We reject this position.

### B.

We turn now to the primary issue before us, whether the Court of Civil Appeals correctly concluded that Somerby's application was not properly considered as an application for

---

review processes prescribed to it by law and yet for reasons beyond its control be foreclosed from receiving that review. See generally Alabama Republican Party v. McGinley, 893 So. 2d 337, 344 (Ala. 2004) (observing that "[t]he hallmarks of procedural due process are notice and 'the opportunity to be heard "at a meaningful time and in a meaningful manner"'" (quoting Mathews v. Eldridge, 424 U.S. 319, 333 (1976), quoting in turn Armstrong v. Manzo, 380 U.S. 545, 552 (1965))).

a "emergency" CON. We answer this question in the affirmative, as did the Court of Civil Appeals.

An "emergency" CON is issued as an exception to the general requirements imposed by the legislature for the issuance of a standard CON. The statutory provision by which this exception is created is § 22-21-268, Ala. Code 1975, which reads as follows:

> "Any person may apply, either independently and without notice under Section 22-21-267 or as a part of an application filed under Section 22-21-267, for an emergency certificate of need for the authorization of capital expenditures made necessary by unforeseen events which endanger the health and safety of the patients. Emergency capital expenditures include, but are not necessarily limited to, emergency expenditures to maintain quality care, to overcome failure of fixed equipment, including heating and air conditioning equipment, elevators, electrical transformers and switch gear, sterilization equipment, emergency generators, water supply and other utility connections. Applications for emergency certificates of need shall include a description of the work to be done and/or equipment to be purchased, the cost thereof, justification for considering the capital expenditure as being of an emergency nature and such other information as the SHPDA may require. Emergency certificates of need issued hereunder shall be subject to such special limitations and restrictions as the duration and right of extension or renewal as may be prescribed in the rules and regulations adopted by the SHPDA."

(Emphasis added.) Ala. Admin. Code (SHPDA) Rule 41.-1-10.01(1), reads in all material respects identically to the

28

statutory language quoted above, except for the addition of one additional example following the reference to "failure of fixed equipment," namely, "damage caused by natural or manmade disaster." (Emphasis added.) Thus, the "emergency" CON has been made available by statute only for the purpose of addressing "unforeseen events" that "endanger the health and safety" of "the patients."

As noted at the outset, the legislature has provided an extensive statutory scheme for assessing and planning for circumstances that bear upon the health-care needs of the public, including, for example, the growth and shifting of populations and advances in technology. In providing for "emergency" CONs, however, the legislature makes reference to "unforeseen events," clearly meaning some event that does not fall within the ambit of the normal assessment and planning process. Moreover, it is not all unforseen events that can justify the issuance of an emergency certificate, but only those unforseen events that, if left uncorrected, actually pose a danger to -- "endanger" -- health and safety. Further still, the danger to be alleviated within the contemplation of emergency-CON statute is not one to the public generally, but

29

to what the statute refers to as "the patients," implying a danger to the applicant's existing patients. This implication, as well as the general nature of the emergency circumstances suggested by all the above-emphasized terms, is borne out by the examples provided by the legislature, which deal generally with equipment failures, such as failures of heating and air-conditioning equipment, elevators, sterilization equipment, etc. A rule or regulation adopted by SHPDA further corroborates this understanding by adding to the list of examples "damage" to an applicant's facilities caused by a "natural or manmade disaster." Clearly, therefore, the legislature (as well as SHPDA) contemplated a true "emergency" as some "event" that by its very nature could not be planned for and that actually endangers the health or safety of an applicant's existing patients, rather than some change or addition to existing plant or services by which a provider could serve new patients or provide new services.

The statutory language makes clear the legislature's intent, and that legislative intent makes sense. If fixed medical equipment suddenly fails, that is an "unforseen event" that could easily "endanger the health and safety of the

patients."  The same is true of "heating and air conditioning equipment" -- if an air-conditioning unit suddenly fails in August, the temperatures inside a building could easily rise to unbearable and clearly dangerous levels.  If the "water supply" of a medical facility is suddenly interrupted or tainted in some way, or if its "emergency generators" or "sterilization equipment" suddenly fails, those are clearly unforeseen events that immediately place at risk the health and safety of patients at the facility.  The addition in the regulation is of the same ilk: if a tornado tears the roof off a surgical facility or frozen pipes burst and destroy patient rooms in a hospital, the health and safety of patients has been endangered immediately.

In contrast, standard CON-approval procedures are consistent with the normal assessment, planning, and approval responsibilities prescribed to SHCC and SHPDA, including the advanced assessments and planning that inform the SHP. Assessing, planning for, and meeting such needs are not within the contemplation of the "emergency" provisions at issue here. Every CON is a certificate that meets a "need."  When unexpected events suddenly put the health or safety of an

applicant's patients at risk, a very different and time-sensitive circumstance is presented.

The circumstances under which Somerby was granted its CON do not meet the specific requirements necessary to qualify for an "emergency" CON. Somerby's application stated that "urgent CON approval is necessary in order to provide proper care for dementia related conditions in the northeastern part of Shelby County." Somerby repeatedly emphasized in its application the pace of population growth in Shelby County and asserted that the county's medical-service providers would not be able to meet the needs of the increasing elderly population with respect to SCALF services unless the emergency CON was approved.

The fact that the aging population in a given county is increasing at a faster pace than in other counties or that the SHCC votes to adjust the SHP as it relates to a given county does not reflect an "unforeseen event" or one that gives rise to an "emergency" within the meaning of the statutes at issue. The changing medical needs of a given community are exactly the type of circumstance that the standard CON-approval process (in conjunction with petitions to modify the SHP) is

1110588

designed to address. Approving an "emergency" CON simply because the change will allow a medical provider to be prepared for a projected increase in demand for a particular medical-service need obliterates any distinction between standard and emergency CONs.

Even leaving aside the failure of the extant circumstances to satisfy the "unforeseen" and "emergency" criteria, there is no "endangerment" here. Somerby did not allege in its application that it had existing patients who would be denied immediate and proper medical care without approval of the emergency CON. Instead, at the CONRB hearing, Somerby offered testimony only that it was unable to offer SCALF services to two potential residents.[13] The record establishes that other facilities exist in the area to serve elderly patients with dementia; the Somerby SCALF beds would merely make such services more convenient.[14]

---

[13]The president of Somerby, Michael Mays, testified at the fair hearing that, since the approval of the emergency CON, Somerby had moved four residents into the SCALF beds and that it had contracts to fill two more beds. Thus, in the midst of the purported "emergency," 18 of the 24 new SCALF beds were not receiving immediate use.

[14]Somerby asserts in a footnote in its brief that "[e]vidence at the Fair Hearing showed that Mrs. Day, a former resident of Somerby who had to move to another facility that

In short, we agree with the following observation made in the main opinion of the Court of Civil Appeals:

> "In seeking an emergency CON, Somerby essentially relied on the same evidence that it relied on in its application for a standard, nonemergency CON. Somerby's application for an emergency CON was based on evidence indicating that there is a general need for SCALF beds in Shelby County, that Somerby could provide services that would meet this need, and that those services would be valuable and convenient. However, that application does not demonstrate an emergency as contemplated by § 22-21-268 and Rule 410-1-10-.01(1). Somerby's emergency CON application is essentially a standard CON application disguised as an emergency CON application."

Daniel Sr. Living of Inverness I, LLC, ___ So. 3d at ___.

---

provided SCALF services, died while waiting for SCALF services at Somerby." Somerby's brief, p. 44 n.19. The testimony at the fair hearing from Stephen Day, Mrs. Day's husband, presents a different picture. Mr. Day testified that he was a resident of Somerby and that he "chose Somerby because of its location and the fact that it was designed with different levels of care including independent living, assisted living, and proposed memory care unit." He stated that Mrs. Day originally also was a resident at Somerby, but that she had Alzheimer's disease, and, because of that, he had moved her "into the closest memory care facility which is about six miles away." Mr. Day testified that he visited his wife once or twice every day at that facility, "[b]ut that much driving is troubling to me and I would welcome the convenience of just being able to walk a short distance several times a day" to see her. (Emphasis added.) Mr. Day added that Mrs. Day had "recently suffered complications which required her to move to a skilled nursing facility 20 miles away." It appears to be undisputed that sometime after Mr. Day's testimony Mrs. Day died while in the skilled-nursing facility.

[substituted p. 34]

Somerby contends that the Court of Civil Appeals failed to give due deference to the governing agency's interpretation of the applicable statute and promulgated regulation. In support of this argument, Somerby cites an exhibit it submitted that listed the CONRB's decisions issuing 28 emergency CONs. A review of those decisions reveals that, although a few of the decisions were substantially analogous to the examples listed in § 22-21-268, it is undeniable that the CONRB has granted emergency CONs in several instances that were not so analogous.

Analogous decisions included the approval of four additional hemodialysis stations needed to accommodate 27 patients who had been displaced from Talladega Dialysis because of damage to the roof, HVAC unit, and interior of that facility caused by a tornado on June 21, 2010; approval for 10 additional hemodialysis stations needed to accommodate patients who would transfer from Dialysis Clinic, Inc.-Dothan to Wiregrass Kidney Center because a facility of Dialysis Clinic, Inc.-Dothan had been destroyed by severe flooding; and approval of the relocation by Dialysis Clinic, Inc., of 19

hemodialysis stations needed to accommodate 106 patients who were displaced due to severe flooding in Dothan.

Decisions that were not analogous included, among others: approval of the acquisition and operation of a linear accelerator for the University of South Alabama Mitchell Cancer Institute because it had "demonstrated a substantially unmet community need for the proposal"; approval of the relocation of the facility for Tuscaloosa University Dialysis because of a projected increase in Tuscaloosa County's elderly population in coming years; and the approval of 10 applications for the relocation of administrative offices for health-care businesses based on projected increases in the elderly populations of the counties in which the businesses were located despite the fact that the decisions acknowledged that no patient care was being provided at the administrative offices.

> "'The fundamental principle of statutory construction is that words in a statute must be given their plain meaning.' Mobile Infirmary Med. Ctr. v. Hodgen, 884 So. 2d 801, 814 (Ala. 2003). 'When a court construes a statute, "[w]ords used in [the] statute must be given their natural, plain, ordinary, and commonly understood meaning, and where plain language is used a court is bound to interpret that language to mean exactly what it says."' Ex parte Berryhill, 801 So. 2d 7, 10 (Ala. 2001) (quoting IMED

Corp. v. Systems Eng'g Assocs. Corp., 602 So. 2d 344,
346 (Ala. 1992))."

Trott v. Brinks, Inc., 972 So. 2d 81, 85 (Ala. 2007).

In this instance, the applicable statute dictates that an
"emergency" CON is authorized when "unforeseen events which
endanger the health and safety of the patients" require
capital expenditures by a health-care facility. It is true
that our precedents provide for weight to be given an
administrative interpretation of the statute by the agency
charged with its administration; however, this is true only
"if the interpretation is reasonable." Ex parte State Dep't
of Revenue, 683 So. 2d 980, 983 (Ala. 1996). The majority of
the CONRB's decisions cited by Somerby do not represent
reasonable interpretations of § 22-21-268. Instead, they
simply redefine the nature of what constitutes an "emergency"
under the statute. Those CONRB decisions cannot amend by
practice what the law itself does not permit.

The decision by the CONRB in this case, like previous
decisions approving "emergency" CONs for changes in medical
services that clearly are not of an emergency nature,
contradicts the law. Unlike most of those other decisions,
however, using the emergency-CON process in a situation like

37

the one presented here also gives an unfair competitive advantage to the service provider that receives the CON. We observed above that emergency-CON applications are usually uncontested. This is not surprising for a true emergency situation, because the condition to be remedied endangers the health and life of existing patients at a medical facility, and the applicant is the only party in a position to address the emergency and to protect the affected patients -- there are no competing applicants. In that circumstance, the notice requirements that apply to standard-CON applications understandably can be bypassed.

In situations like the present case, however, there is no "emergency" that must be addressed in order to alleviate some immediate unexpected danger to the health and safety of Somerby's patients; rather the "emergency" is based on meeting the health-care needs of a county whose aging population is growing. It is often the case, as here, that there is more than one medical facility that would compete for the opportunity to meet such needs, if given notice and an opportunity to do so. Granting an emergency CON to one facility to meet such a broad medical need undermines the

integrity of the review process. Returning to the clear distinction provided by the law between emergency and standard CONs prevents applicants from "gaming the system."

The emergency CON issued in the present case, if allowed to stand, would allow the aforesaid "gaming" to rise to a new level. As Judge Moore noted in his special concurrence below, in the oral argument before the Court of Civil Appeals "counsel for the parties acknowledged that the CONRB had never in its history issued an emergency CON on the basis that the State Health Plan had underestimated a need for certain beds in a particular area." Daniel Sr. Living of Inverness I, LLC, ___ So. 3d at ___ n.5 (Moore, J., concurring specially).

The chairman of the CONRB as much as admitted the need for today's decision. During the CONRB's hearing on an emergency-CON application filed by Danberry (after the CONRB's approval of Somerby's emergency CON) to host the remaining 12 SCALF beds of the original 36 SCALF beds approved in the SHP, the chairman stated: "If you wanted to be very technical about the definition of an emergency, and I admit we have gone outside that definition a few times, we have, but at what

point do we go back to the purity of what the law says about what an emergency is?" (Emphasis added.)

The CONRB denied Danberry's application for an emergency CON on the ground that it did not fit within the definition of an "emergency" under § 22-21-268. By the same token, it should have denied Somerby's application for an "emergency" CON. By upholding the Court of Civil Appeals' decision to this effect, we hopefully have reached "the point" about which the chairman inquired.

## IV. Conclusion

The Court of Civil Appeals correctly ruled that the CONRB erred by granting Somerby an emergency CON. We affirm that court's decision reversing the judgment of the circuit court.

AFFIRMED.

Stuart, Bolin, Parker, Shaw, Main, and Wise, JJ., concur.

Moore, C.J., concurs in part and dissents in part.

Bryan, J., recuses himself.*

\*Justice Bryan was a member of the Court of Civil Appeals when that court considered this case.

MOORE, Chief Justice (concurring in part and dissenting in part).

I agree with the statement in the main opinion that the vesting of a certificate of need ("CON") does not "cut off" the right of an opponent to the CON to judicial review; otherwise, I dissent.