THOMAS, Judge.
Select Specialty Hospitals, Inc., d/b/a Select Specialty Hospital-Birmingham (“Select”), has operated a 38-bed, long-term acute-care hospital (“LTACH”) on the campus of the general acute-care hospital operated by Affinity Hospital, LLC, d/b/a Trinity Medical Center of Birmingham (“Trinity”), since 2002.[1] Trinity is relocating its hospital, and it informed Select that it would not have sufficient room at its new campus to house the LTACH operated by Select. Select’s lease with Trinity provided that, upon its termination, Select would
“peaceably quit and surrender to [Trinity] any rights that [Select] may have by virtue of this Lease to own, lease, operate, build, or otherwise possess or be affiliated with the Beds, or the going concern of the long term acute care hospital, operated by [Select] in the Facility. Upon such surrender, [Select] shall fully cooperate with [Trinity] to enable [Trinity] to obtain all such licenses, permits, certifications, and any other such items necessary to operate the Beds as hospital beds and the Premises as a duly licensed long term acute care hospital and to the extent permitted under applicable law, qualify for third-party payor programs, such a Medicare or Medicaid.... Nothing herein shall be deemed to prohibit [Select] from applying for the necessary licenses to operate another long term care hospital at any other location.”
Select sought a new location for its LTACH, and Select and Brookwood Health Services, Inc., d/b/a Brookwood Medical Center (“Brookwood”), entered negotiations to house Select’s LTACH at Brookwood’s campus. In February 2014, Select sought a certificate of need (“CON”) to “relocate” its LTA.CH beds from Trinity’s campus to Brookwood’s campus. No-land Hospital Shelby, LLC (“Noland Shelby”), and Noland Hospital Birmingham, LLC (“Noland Birmingham”)(sometimes collectively referred to as “Noland”), filed a request for a declaratory ruling in which they requested that Select’s CON application be dismissed because Select had no right to “relocate” the LTACH beds at Trinity’s campus, which beds, pursuant to the lease, would revert to Trinity upon the termination of the lease. The Certificate of Need Review Board (“the CONRB”) of the State. Health Planning and Development Agency (“SHPDA”)[2] dismissed Se *754 lect’s February 2014 CON application because it had not sought to convert acute-care beds from another source, as required by the State Health Plan (“the SHP”). See Ala. Admin. Code (SHPDA), Rule 410-2-4-.02(8)(c).
Select filed a second CON application in June 2014. In the second CON application, Select proposed' to lease 38 excess general acute-care beds from Brookwood. Select sought a contested-case hearing on its own application, and Noland intervened. After a 10-day, contested-case hearing before an administrative-law judge (“ALJ”), the ALJ issued a 66-page recommended order in which he recommended denial of Select’s CON application because, he determined, the CON application was not consistent with the SHP. He outlined a myriad of reasons that Select’s CON application should not be approved, including, among other determinations, that Select had failed to meet each of the criteria outlined in Ala.Code 1975, § 22-21-266. The CONRB, after a brief hearing, rejected the ALJ’s recommendation and entered a five-page order concluding that Select’s application met the criteria specified in § 22-21-266 and approving the requested CON. Noland first sought reconsideration of the CONRB’s order, but it withdrew that request and filed a notice of appeal.
As a preliminary matter, we must consider Select’s motion to dismiss this appeal and determine whether Noland timely appealed the CONRB’s order. ■ The CONRB’s ruling was issued on January 21, 2015, and became final on February 5, 2015. See Ala.Code 1975, § 22-21-275(13) (indicating that the CONRB’s ruling becomes final 15 days after it is issued). Noland timely sought reconsideration of the CONRB’s ruling on February 19, 2015, within 15 days of the date the CONRB’s ruling became final, as required by Ala. Code 1975, § 22-21-275(12). See also Ala. Admin. Code (SHPDA), Rule 410-1-8-.09. According to § 22-21-275(12), the “[rjequest for reconsideration ... shall have the effect of holding in abeyance the final .decision and suspending any certificate of need issued thereto, subject to the outcome of the public hearing” on reconsideration. See also Ala. Admin. Code (SHPDA), Rule 410-1-8-.13. Noland withdrew its request for reconsideration on March 16, 2015, and then filed a notice of appeal with this court on March 17, 2015. See § 22-21-266(6).
Select argues that Noland’s notice of appeal was untimely, because it was filed 40 days after the CONRB’s ruling became final on February 5, 2015, instead 'of within 21 days' of that date as permitted by §• 22-21-275(6). The'pertinent statutes and administrative rulés make clear that the CONRB’s ruling is held in abeyance and is hot considered final until after any request for reconsideration has been resolved. Ala.Code 1975, § 22-21-275(12); Ala. Admin. Code (SHPDA), Rule 410-1-8-.13; see also Ex parte STV One Nineteen Sr. Living, LLC, 161 So.3d 196, 203-04 (Ala.2014) (explaining that, under § 22-21-275(12) & (14), a request for reconsideration or for a fair hearing holds the CONRB- ruling “in abeyance” and suspends any CON issued by the ruling). Select argues that Noland’s ■ request for reconsideration has no bearing on the timeliness of its appeal because, Select contends, Noland’s- withdrawal of the request for reconsideration rendered the request a nullity. ‘ However, nothing in the applicable statutes, or administrative rules *755 explains the effect of a withdrawal of a request for reconsideration.-
Select relies on Ex parte Sealy, L.L.C., 904 So.2d 1230 (Ala.2004), in support of its argument. Ex parte Sealy involved the voluntary dismissal of a circuit-court action by a plaintiff. Noland did not dismiss an action. Instead, as Noland contends, Noland’s action is more analogous to the withdrawal of a postjudgment motion by the filing of a notice of appeal, an issue this court considered in Griffin Wheel Co. v. Harrison, 568 So.2d 1248, 1249 (Ala.Civ. App.1990). In Griffin Wheel, this court determined that the withdrawal of a post-judgment motion after the 42-day period for filing an appeal had expired but before the motion was ruled upon did not prevent the postjudgment motion from having effectively tolled the time for filing the appeal.[3] We agree with' Noland that the request for reconsideration was effective to hold the CONRB’s ruling in abeyance until that request was either ruled upon or withdrawn. See, e.g., Rosier v. Derwinski, 1 Vet.App. 241, 249 (1991) (concluding that the denial or withdrawal of a motion for reconsideration in an administrative proceeding triggers the appeal period); see also Tideland Welding Serv. v. Sawyer, 881 F.2d 157, 160 (5th Cir.1989) (rejecting the conclusion that a party that withdraws a motion for reconsideration under the federal Longshore and Harbor Workers’ Compensation Act must file its notice of appeal within the appeal period running from the date of the entry of the original order and stating that the court had found “no support for the ... statement that a perfected motion for reconsideration that is later withdrawn fails to toll the period for filing a notice of appeal”). Thus, we conclude that Noland’s notice of appeal, which was filed the day following its. withdrawal of its request for reconsideration, was timely filed.
Turning now to the merits of the appeal, we begin by recognizing our standard of review of a decision of the CONRB granting or denying an application for a CON. Review of agency decisions is governed by Ala.Code 1975, § 41-22-20(k), a part of the Alabama Administrative Procedure Act:
“Except where judicial review is by trial de novo, the agency order shall be taken as prima facie just and reasonable and the court shall: not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact, except where otherwise authorized by statute. The court may-affirm the agency .action or remand the case to the agency for taking additional testimony and evidence or for further proceedings. The court may reverse or modify the decision or grant other appropriate relief from the agency action, equitable or legal, including declaratory relief, if the court finds that the agency action is due to be set aside or modified under standards set forth in appeal or, review statutes applicable to that agency or if substantial rights of the petitioner have been prejudiced because the agency ac■tion is any one or more of the following:
“(1) In violation of constitutional or statutory provisions;
‘•‘(2) In excess of the statutory authority of the agency;
“(3) In violation of any pertinent agency rule;
“(4) Made upon unlawful procedure;
“(5) Affected by other error of law;
*756 “(6) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
“(7) Unreasonable, arbitrary, or capricious, or characterized by an abuse of discretion or a clearly unwarranted exercise of discretion.”
Furthermore, we have explained:
“In reviewing the decision of a state administrative agency, ‘[t]he special competence of the agency lends great weight to its decision, and that decision must be affirmed, unless it is arbitrary and capricious or not made in compliance with applicable law.’ Alabama Renal Stone Inst., Inc. v. Alabama Statewide Health Coordinating Council, 628 So.2d 821, 823 (Ala.Civ.App.1993). ‘The weight or importance assigned to any given piece of evidence presented in a CON application is left primarily to the [CONRB’s] discretion, in light of the [CONRB’s] recognized expertise in dealing with these specialized areas.’ State Health Planning & Dev. Agency v. Baptist Health Sys., Inc., 766 So.2d 176, 178 (Ala.Civ.App.1999). Neither this court nor the trial court may substitute its judgment for that of the administrative agency. Alabama Renal Stone Inst., Inc. v. Alabama Statewide Health Coordinating Council, 628 So.2d 821, 823 (Ala.Civ.App.1993). ‘This holds true even in cases where the testimony is generalized, the evidence is meager, and reasonable minds might differ as to the correct result.’ Health Care Auth. of Huntsville v. State Health Planning Agency, 549 So.2d 973, 975 (Ala.Civ.App. 1989). Further, ‘an agency’s interpretation of its own rule or regulation must stand if it is reasonable, even though it may not appear as reasonable as some other interpretation.’ Sylacauga Health Care Ctr., Inc. v. Alabama State Health Planning Agency, 662 So.2d 265, 268 (Ala.Civ.App.1994).”
Colonial Mgmt. Grp., L.P. v. State Health Planning & Dev. Agency, 853 So.2d 972, 975 (Ala.Civ.App.2002).
The voluminous record in this case contains over 2,500 pages of testimony and over 150 exhibits. This opinion will provide a summary of the evidence pertinent to the issues decided, but it will not exhaustively detail the complex financial and statistical evidence contained within the record. The record reflects without dispute that the SHP in effect indicates that the bed need for LTACHs in Region III, which is the region including both Jefferson and Shelby Counties, is 116. At present, Region III has a total of 135 LTACH beds in operation: 38 by Select, 45 by Noland Birmingham, and 52 by Noland Shelby. The average daily census of LTACH beds is 63.57, which indicates that, on average, roughly 64 LTACH beds are filled per day. The occupancy rate for the Region III LTACHs is 47%. In 2013, Select had an average daily census of 27.07. Noland Birmingham had an average daily census during the same year of 25.68; Noland Shelby had an average daily census of 10.82.
Select presented evidence concerning the expected increase in the population, and especially the population over age 65, in all the counties in Region III. The evidence suggested that, generally, approximately 70% of LTACH patients are Medicare recipients, who are over the age of 65. Select also presented the testimony of Dan Sullivan, a health-care planning consultant, who testified that the closure of Select’s LTACH would negatively impact Region III. Sullivan explained that, although the region is technically overbedded, closure of Select’s LTACH would reduce the total amount of LTACH beds in the region to 97, leaving the region underbedded by 19; *757 furthermore, Sullivan testified that Jefferson County, which is the most populated county in the region, could itself support 93 LTACH beds and that closure of Select’s LTACH would reduce the number of beds available in Jefferson County to only 45. Those reductions in available LTACH beds, Sullivan opined, would be detrimental to the Region III health-care system and could result in difficulty finding LTACH services for the increasing population over age 65. Sullivan noted that the federal government has instituted a moratorium on the establishment of new LTACHs and that, therefore, if Region III loses the 38-bed Select LTACH, a new LTACH could not be established until after the expiration of the moratorium in 2017.[4]
In contrast, Noland presented evidence concerning new federal Medicare regulations aimed at restricting LTACH-appro-priate patients. The new regulations will require that, in order for an LTACH to be reimbursed at higher LTACH rates, an LTACH patient must have either spent three days in an intensive-care unit during the immediately preceding acute-care hospital stay or be ventilator dependent when admitted to an LTACH.[5] John Heffner, an expert proffered by Noland, opined that the new regulations would negatively impact the LTACH industry in the coming years, despite any expected increase in the population over age 65. He testified that any growth in the population over age 65 might not result in increased LTACH census numbers because of the limitations imposed on LTACH admission criteria by the new regulations. He stated that the new regulations would have a negative impact on admissions and on revenue. Although he admitted that an LTACH could admit patients that did not meet the new criteria, he said that the lower reimbursement rates for patients who did not meet the new criteria would require most LTACHs to require that at least 50% of their patients meet the new criteria in order to make the LTACH financially viable.
Similarly, Robert Lewis Monroe, a consultant proffered, as an expert by Noland, testified that he expected a “stagnation of LTACH utilization.” He explained that the LTACHs compete with skilled-nursing facilities and inpatient-rehabilitation hospitals for patients; according to Monroe, skilled-nursing facilities are becoming more competitive and able to care for the more critically ill patient. Monroe also noted that the new regulations would redefine the appropriate LTACH patient. This redefinition, according to Monroe, would decrease the number of Medicare LTACH patients nationwide between 30% and 40%. Furthermore, Monroe testified that the new regulations would change reimbursement rates for Medicare patients to what he called “site-neutral” payments, which, he explained, meant that LTACHs would receive the same, lesser reimbursement for patients who did not meet the new criteria as would be paid for the same patient at a skilled-nursing facility, a rehabilitation hospital,, or a general acute-care hospital. This regulatory change, said Monroe, would result in a “significant diminishment in reimbursement” of approximately 50% for LTACHs. Monroe disagreed with Select’s projection in its CON application that it would increase its daily census, patient revenues, and profit margin in 2015 and 2016; however, on cross-examination Monroe admitted that the new regulations would not apply to Select until September 1, 2016, indicating that, perhaps, Select’s projections, which featured *758 the anticipated increases, would not -be impacted by the new regulations during the period preceding September 2016. Overall, Monroe opined that' LTACHs would be competing with the skilled-nursing facilities and rehabilitation hospitals for a much reduced pool of potential patients and that the change .in reimbursement rates would negatively impact the financial viability of LTACHs over the next few years. '
Andrea White, the chief executive officer of Select, testified that, in her opinion, closing Select’s LTACH would have a detrimental impact on the Region III healthcare system because the health-care system would not be able to provide the necessary continuum of care; she said that general acute-care hospitals, s,killed-nursing facilities, and rehabilitation hospitals are unable to provide the expertise needed to appropriately care for patients who need extended recovery periods and specialized care, like wound care, ventilator weaning, or respiratory therapy. White said that Select’s occupancy rates had been increasing; in 2014, she said, Select was “on pace” for 370 admissions. She said that. Select maintained an occupancy rate of over 70% and that the average daily census for the year-to-date in 2014 was 27:2. She noted that Select receives referrals from 78 hospitals and that Select also serves patients in Region I and Region II, which have no LTACH providers. According' to White, if Select’s. LTACH were to close, there would be an insufficient number of. LTACH beds in- the -marketplace to meet the needs of the expected LTACH population. However, on cross-examination, she admitted that Noland could absorb the patients but said - that patient choice would be eliminated if Select were forced to close its LTACH.
Noland raises several arguments in support of its appeal óf the CONRfe’s ruling approving of Select’s CÓN application. Noland first argues that the CON requested by Select is not consistent with the SHP and therefore does not satisfy § 22-21-266(1). See Nursing Home of Dothan, Inc. v. Alabama State Health Planning & Dev. Agency, 542 So.2d 935, 939 (Ala.Civ. App.1988) (indicating that a CON application inconsistent with the SHP must be denied). Noland’s first argument rests on its' contention that the CON application seeks 38 LTACH beds in addition to'the 135 LTACH beds already in operation in Region III.[6] According to Noland, because of the language of Select’s lease with Trinity, the 38 LTACH beds currently operated by Select revert to Trinity upon the termination of the lease. Thus, Noland contends, pursuant to Ala. Admin.- Code (SHPDA), Rule 410-1-11-.08, those 38 LTACH beds must remain in the bed count for purposes of the SHP and healthcare planning until either (1) Trinity, in writing, releases those beds or (2) the beds are out of operation for a period, of one year. As Noland contends, Ala. Admin, Code (SHPDA), Rule 410-1-11-.08, states that a CON must either be surrendered in writing or will be deemed abandoned after the facility or the health-care service is discontinued for a period of 12 uninterrupted months.
However, the beds used by Select in operating' its LTACH will be converted back to acute-care hospital beds owned by Trinity. Select, and not Trinity, owns- the CON permitting the operation of the LTACH; Based on the plain language of the administrative rules, the CONRB *759 could reasonably have concluded that Ala. Admin. Code (SHPDA), Rule 410-1-11-.08, did not apply, as’Noland insists it does, to Trinity in the present situation because Trinity does not own the CON and therefore could not have surrendered or abandoned it. Sylacauga Health Care Ctr., Inc. v. Alabama State Health Planning Agency, 662 So.2d 265, 268 (Ala.Civ.App, 1994) (stating that “an agency’s interpretation of its , own rule or regulation must stand if it is -reasonable, even though it may not appear as reasonable as some other interpretation”). In its application for the CON to operate an LTACH at Brookwood’s campus. Select, the owner of the existing CON, states that it will cease operating the LTACH at Trinity’s campus as of the date Trinity relocates its hospital. Select has, therefore, met the requirement of 410-1-11-.08 that the owner of the CON relinquish the CON in writing and that it state the effective date of that action. Therefore, we cannot agree that the fact that the beds currently utilized by Select will be surrendered to Trinity require their continued inclusion in the LTACH bed count under Rule 410-1-11-.08 until Trinity either relinquishes the beds in writing or abandons them for a period of one year. Because we have rejected No-land’s contention that the CONRB’s approval of Select’s application violates the SHP because it requests an additional 38 LTACH beds above the 135 LTACH beds already in existence, we conclude that the CONRB properly determined that the application was not inconsistent with the SHP in that respect.[7]
Noland next argues that the CONRB acted arbitrarily and capriciously in approving Select’s CON application because, Noland contends, the application does not meet any of the other applicable necessary criteria set out in § 22-21-266. That statute reads:
“No certificate of need for new inpatient facilities or services shall be issued unless the SHPDA makes each of the following findings: - -
“(1) That the proposed facility or service is consistent with the latest approved revision of the appropriate state plan effective at the time the application was received by the state agency;
“(2) That less costly, more efficient or more appropriate , alternatives to such inpatient service are not available, and that the dévelopment of such alternatives has been studied and found not practicable;
“(3) That existing inpatient facilities providing inpatient services similar to those proposed are being used in an appropriate and efficient manner consistent with community demands for services;
“(4) That in the case of hew construction, alternatives to new construction (e.g., modernization and sharing arrangement) have been considered and have been implemented to the maximum extent practicable; and
“(5) That patients will experience serious problems in obtaining inpatient care of the type proposed in the absence of the proposed new service.”
§ 22-21-266.
We have already dispensed with Noland’s argument concerning § 22-21- *760 266(1), so we will next consider Noland’s argument that Select failed to establish that it had considered and rejected alternatives to its proposal to establish an LTACH at Brookwood’s campus. Noland complains that a CON application must state alternatives to the proposed project or explain why the proposal being advanced was chosen and that the CON application submitted by Select does not meet this requirement. Thus, Noland contends, Select has failed to satisfy the requirement that it consider and reject other alternatives to establishing an LTACH at Brookwood’s campus, as required by § 22-21-622(2). Select’s CON application states in its entirety: “There is no alternative to this project. If Select is not permitted to relocate, it will have to close its LTACH.”
Noland makes much of the failure of the CON application to specify what alternatives to establishing the LTACH at Brook-wood’s campus Select had considered. Noland’s expert, Monroe, testified that Select had three possible alternatives when it learned that it would not be able to relocate its LTACH at the new Trinity campus: to close the LTACH, to enter into a joint venture with an existing LTACH or hospital operator, or to request a new CON for a lesser number of LTACH beds.[8] Select acknowledged in its CON application that, if it were unable to secure the requested CON, it would be required to close its LTACH. Based on the testimony at the hearing before the ALJ, it was clear that Select considered closing its LTACH to be an untenable option. White testified that closing Select’s LTACH would have a detrimental impact on the health-care system because Select had an impressive record of assisting patients with weaning from ventilators and of providing quality care to those patients needing longer hospital stays in order to heal from an accident or other medical event. Furthermore, White testified that Select had accepted patient referrals from 78 hospitals, including hospitals from both inside and outside Region III and hospitals outside the state of Alabama; notably, Select and Noland provide the only LTACH services in the northern half of Alabama. Thus, it appears that Select rejected the alternative of closure because it considered its services valuable to the health-care system.
White admitted that Select had not considered a joint venture, but she noted that Select had not pursued a joint venture ■with another local provider because it already existed in the market as a separate provider. Sullivan testified that Select’s entering into a joint venture would not result in cost savings to the system; he also noted that he was not aware of any joint-venture opportunity in the market of which Select could have availed itself. Thus, we conclude that the CONRB could have determined that Select’s alleged “failure” to have outlined why it did not consider or reject a speculative joint venture was not a violation of the requirement that Select consider and reject “less costly, more efficient or more appropriate alternatives.” § 22-21-266(2).
Noland next contends that the evidence presented to the ALJ does not support the CONRB’s conclusion that “existing inpatient facilities providing [LTACH services] are being used in an appropriate and efficient manner consistent with community demands for services.” § 22-21-266(3). Indeed, the evidence on this point was sharply conflicting. As noted, the occupancy rates for the existing LTACHs is a mere 47%. Although *761 there was abundant testimony indicating that the federal regulatory changes taking effect in 2015 and 2016 would negatively impact the availability of LTACH-appro-priate patients in the market, other evidence indicated that the population, and especially the population over age 65, is expected to increase substantially over the next 10 years. Some, of the testimony indicated that the regulatory changes would have a catastrophic effect on LTACHs, but other testimony indicated that the impact of the regulatory changes would not be felt until after 2016, that the increase in the aging population would offset..the limitations imposed by the .regulatory changes, and that the LTACHs would adapt to the changes so as to minimize their impact as they had in the past. As we have explained, we must defer to the special .competence of the CONRB in determining, the weight or importance of the evidence presented to it. State Health Planning & Dev. Agency v. Baptist Health Sys., Inc., 766 So.2d 176, 178 (Ala.Civ.App. 1999). We are not permitted to substitute our judgment for that of the CONRB, “‘even in cases where the testimony is generalized, the evidence is meager, and reasonable minds might differ as to the correct result.’ ” Colonial Mgmt. Grp., 853 So.2d at 975 (quoting Health Care Auth. of Huntsville v. State Health Planning Agency, 549 So.2d 973, 975 (Ala.Civ.App.1989)). Thus, we are not in a position to substitute our view of the conflicting evidence for the view of the CONRB, whose specialized knowledge gives it greater insight into the health-care market than this court has.
We turn now to Noland’s, argument that Select failed to prove that patients would have serious problems obtaining LTACH care if the CON for the Select LTACH were denied. See § 22-21-266(5). The record contains statements from several witnesses who opined that closing the Select LTACH would deprive patients of the ability to find LTACH care in Region III. This testimony is supported by the evidence demonstrating that the population over age 65 will continue to grow rapidly in Region III, especially in Jefferson and Shelby Counties. -In contrast, there was significant evidence indicating that, based on the occupancy rate of 47% and the average daily census of the three LTACH facilities of 63.57, Noland could absorb all the patients in the region. Surely, one view of the evidence would support the conclusion that, in fact, patients will not suffer serious difficulty finding LTACH services even if the Select LTACH is no longer available. However, as we have already explained, we are not to substitute our judgment for that of the CONRB, whose specialized knowledge is to be given deference. Colonial Mgmt. Grp., 853 So.2d at 975 (quoting Health Care Auth. of Huntsville, 549 So.2d at 975). Thus, although the evidence in support of the conclusion that patients would suffer difficulty in securing LTACH services if the CON were denied might appear less compelling than the evidence supporting the opposite conclusion, we must conclude that the CONRB’s determination that denial of Select’s CON application would result in serious problems in obtaining LTACH care is not arbitrary or capricious or clearly erroneous.
Noland next argues that Select failed to present evidence sufficient to satisfy the “vast majority’.’ of the supplemental-review criteria to be applied by the CONRB under Ala. Admin. Code (SHPDA), Rule 410-l-6-.01(l)(b), which states: “The proposal for the new institutional health service, health care facility and/or capital expenditure shall be consistent with additional criteria prescribed by regulation adopted under state law as well as all other applicable state and local re *762 quirements to which the proposal may be related.” Noland states that the CONRB must consider 22 supplemental-review criteria; however, Noland’s brief lists only 5 of the supplemental criteria. Noland does not make any argument regarding those supplemental criteria other than to state that “the ALJ found that the evidence in the record clearly and overwhelmingly shows that the Application fails to satisfy 18 of 22 supplemental Review Criteria” and to provide a brief parenthetical after each criteria with a statement of “fact” that, presumably, Noland believes supports the conclusion that the criteria was not met. Noland also fails to explain where we can find the supplemental criteria or to provide any authority applying or construing them. We have cautioned many a litigant-that we will not develop an argument on appeal for an appellant, see Kids’ Klub, Inc. v. State Dep’t of Human Res., 874 So.2d 1075, 1100 (Ala.Civ.App. 2003), or search the record for evidence to support a - particular argument. State Dep’t of Transp. v. Reid, 74 So.3d 465, 469 (Ala.Civ.App.2011) (quoting Ellison v. Green, 775 So.2d 831, 833 (Ala.Civ.App. 2000), quoting in turn Brown v. Brown, 719 So.2d 228, 230 (Ala.Civ.App.1998)) (stating that “ ‘ “[i]t is not the function of this court to search a record on appeal to find evidence to support a party’s argument” ’ ”). We therefore decline to further consider Noland’s argument regarding the supplemental criteria. See Huntsville Hous. Auth. v. State Licensing Bd. for Gen. Contractors, 179 So.3d 146, 147 (Ala. Civ.App.2014).
Noland next contends that Select was not the appropriate applicant for the CON. Noland first argues, based on language in Ala. Admin. Code (SHPDA), Rule 410-2-4-.02(8)(c), that the appropriate applicant for the CON was Brookwood and not Select. Rule 410-2-4-.02(8)(c) states:
“(c) Alabama has an excess of licensed general -acute care hospital beds, some of which could be used for long-term hospital care. Therefore, a general acute care hospital may apply for a certificate of need to convert acute care beds to long-term acute care hospital beds if the following conditions are met:
“1. The hospital can satisfy the requirements of a long-term acute care hospital as outlined above.
“2. The long term acute care hospital can demonstrate that it will have a separate governing body, a separate chief executive officer, a separate chief medical officer, a separate medical staff, and performs basic functions of an independent hospital.
“3. The long term acute care hospital has written patient transfer agreements with hospitals other than the host hospital to show that it could provide at least 75 per cent of the admissions to the long term acute care hospital, based on the total average daily census for all participating hospitals.
“4.' The transfer agreements are with other hospitals in the same county and/or with hospitals in a region.”
Select points out that the rule uses the term “may,” as opposed., to “shall” or “must,” indicating that a host hospital, like Brookwood, is permitted, but not required, to submit an application to convert general acute-care beds to LTÁCH beds. We further note that, in order to make such an application, the host hospital must be able to “satisfy the requirements of a long-term acute care hospital,” Rule 410-2-4-.02(8)(c)l., which include “an agreement [with Centers for Medicare and Medicaid Services] to participate as a general medical surgical acute care hospital” and that its “average- inpatient length of stay is greater than 25 days.” Ala. Admin. Code *763 (SHPDA), Rule 410-2-4-.02(8)(a). Thus, unless the host hospital meets those requirements, it cannot, under the rule, apply for .conversion of its beds. Furthermore, and even more persuasive, is the fact that SHPDA has permitted LTACH operators, including. Select in its earlier application, to seek and receive CONs. for the operation of LTACHS based on conversion of general acute-care beds from their host hospitals. As we have stated, SHPDA’s interpretation of its own rules are given considerable deference by this court. Sylacauga Health Care Ctr.’,- - 662 So.2d at 268 (stating that “an agency’s interpretation of its own rule or regulation must stand if it is reasonable, .even though it may not appear as reasonable, as some other interpretation”). In light of the fact that most LTACHs are created based on a hospital-within-a-hospital model, we cannot conclude that SHPDA’s interpretation of its rule so as to recognize the actual LTACH operator as a proper applicant for a CON is not a reasonable one.
Noland next argues that Select'is not a proper applicant for the CON because of Select’s failure to attach an exe-cutéd lease with Brookwood to the CON application, which,. Noland contends, indicates that Select lacks any interest upon which to base its right to seek a CON to operate an LTACH at Brookwood’s campus. We note that Noland fails to support its argument on this point with any authority requiring that an executed lease be attached to a CON application, and we are not aware of any such authority. In any event, had Select entered into a lease with Brookwood before securing the CON, its doing so would have violated Ala.Code 1975, § 22-21-265, and Ala. Admin. Code (SHPDA), Rule 410-1-2-.19, which prohibit an entity from acquiring, constructing, or operating a new health service before receiving a CON; “acquisition” is defined in § 22-21-260(1) as “[obtaining the legal equitable title to a freehold or leasehold estate or otherwise obtaining the substantial benefit of such titles or estates, whether by purchase, lease, loan or 'suffrage, gift, devise, legacy, settlement of a trust or means whatever, and shall include any act of acquisition.” See Lloyd Noland Found., Inc. v. City of Fairfield Healthcare Auth., 837 So.2d 253, 264 (Ala.2002) (considering a' similar argument relating to whether an entity could seek a CON when it did not have legal title to beds for which it sought that CON). Thus, we reject Noland’s argument thdt Select is not an appropriate applicant because it failed to attach a copy of an executed lease with Brookwood to its CON. application.
Wé now turn to Noland’s argument that SHPDA’s failure to initiate a “batching cycle” to allow other providers to seek to establish new LTACH beds should have prevented approval of Select’s CON.. According to Ala. Admin. Code (SHPDA), Rule 410-l-7-.19(l), “Matching is the formal review in the same 90-day review cycle and ■ comparative consideration of all completed applications pertaining to similar types of services, facilities, or equipment' affecting the same health service area.” As Select contends, however,' whether batching occurs is left to SHPDA’s discretion: “Formal batching pursuant to this section is permissive and not mandatory.... The determination whether formal batching pursuant to this section should be followed shall be made by the executive director in his discretion.” Rule 410 — 1—7—. 19(9).
Noland contends that SHPDA’s failure to “batch” Select’s CON application prevented it or any other provider for competing for what it characterizes as “newly created LTACH beds” that resulted from the.approval of Select’s CON application. We have explained that the 38 LTACH *764 beds converted from Brookwood’s acute-care hospital beds are not additional beds and do not increase the number of LTACH beds currently in existence in Region III. Practically speaking, although we understand Noland’s contention that Select is not truly relocating its LTACH beds because it does not own those beds, it Is clear that the CONRB viewed Select’s proposal as one seeking to maintain the status quo by continuing to provide the same LTACH services, albeit in a different host hospital because its current host hospital is relocating to a smaller campus. Contrary to Noland’s assertions, Select did not control whether its CON application was batched. SHPDA clearly exercised its discretion to forgo a “batching cycle,” and Noland has not provided any authority indicating that its decision to do so is reviewable or that SHPDA’s decision was an arbitrary and capricious exercise of its rather broad discretion.
Finally, we turn to Noland’s argument that the CONRB predetermined the approval of Select’s CON application before it considered the evidence and No-land’s arguments against the CON application. Noland rests this argument on statements made by the chairman of the CONRB that indicated that he had thought the “issue” had been “settled” in Select’s earlier CON proceeding. The chairman stated at the beginning of the hearing:
“[T]his issue actually has been around for a long time. We actually started last March, and I’m really surprised we’re even back on this issue. You know, I thought it was pretty well settled in March of last year. And we’ll get into more of that in a minute. But that’s my personal belief.”
He further stated at the conclusion of the hearing: “So the reason why I’m upset is that I thought this issue was actually resolved in March, and then y’aH are back here today.”
Although we understand Noland’s concern over the chairman’s statements, we note that the chairman did not make the motion to reject the ALJ’s proposed order or vote on Select’s CON application. The chairman explained that “normally the chairman doesn’t make a motion, doesn’t vote; but since today we have five, depending on how these gentlemen vote, I will either have to vote or not vote.... [I]f there is a tie, then I will be the tiebreaker, which very rarely ever happens.” General Ed Crowell made the motion to reject the ALJ’s order, stating:
“I have read and reviewed all of the documentation provided very, very carefully. I’ve listened to the testimony presented by both sides here today. And if I’m in order, I’d like to make a motion that we basically, that we reject the ALJ’s recommendation order and grant Select’s application for reasons set forth in Select’s exceptions.”
The motion was seconded by Randy Jones, and the other members of the CONRB voted unanimously to reject the ALJ’s recommended order and to approve Select’s CON application. Based on the fact that the chairman did not participate in the vote and because General Crowell specifically stated that he had reviewed the documentation and listened to the testimony presented by the parties at the hearing before the CONRB, we cannot agree that the record demonstrates that the CONRB, as a whole, “prejudged” Select’s application.
Our review of the administrative record, with the attendant presumption in favor of the CONRB’s decision, has not convinced us that the CONRB’s decision is due to be overturned. We cannot conclude that the CONRB’s decision is clearly erroneous in view of the whole record or that the *765 CONRB exercised its considerable discretion in an arbitrary or capricious manner. We can find no error of law or failure on the part of the CONRB to comply with its statutory duties. Accordingly, we affirm the CONRB’s decision to grant Select a CON to operate a LTACH at Brookwood’s campus.
AFFIRMED.
THOMPSON, P.J., and PITTMAN, MOORE, and DONALDSON, JJ., concur.

. The record indicates that most LTACHs are operated as a hospital-within-a-hospital; that is, the LTACH is operated by a separate entity but is housed inside an existing acute-care hospital. See Select Specialty Hosps., Inc. v. Alabama State Health Planning & Dev. Agency, 112 So.3d 475, 477 (Ala.Civ.App.2012).

. "In the health-care-services regulatory scheme, the terms ‘SHPDA’ and ‘CONRB’ are deemed synonymous and are used interchangeably. Ala. Admin. Code (SHPDA) Rule 410-1-2-.01. For ease of undérstanding, we generally réfer to the panel of individuals that holds hearings on CON applications as the *754 CONRB, while using the term SHPDA to refer to the agency in its more general regulatory capacity.”
Ex Parte STV One Nineteen Sr. Living, LLC, 161 So.3d 196, 199 n. 2 (Ala.2014).

. We note that Rule 4, Ala. R.App. P., was amended in 1994 to provide that a notice of appeal filed before the resolution of a pending postjudgment motion does not withdraw the motion from consideration but, instead, that the appeal is held in abeyance pending ruling on that motion. Rule 4(a)(5), Ala. R.App. P.

. See 42 C.F.R. § 412.23(e)(6)(i).

. See 42 U.S.C. § 1395ww(m)(6)(A)(iii) & (iv).

. Noland does not argue that Select's request • for a 38-bed LTACH violates the,SHP because the addition of those 38 beds to the 97 beds operated by Noland would exceed the Region III LTACH 116-bed limit stated in the SHP.

, Because we have concluded that Select’s CON application does not seek to add additional LTACH beds beyond the 13S already in existence, we pretermit discussion of the appropriateness of the alternate bed-need methodology utilized by Select to further support its CON application. See Pleasure Island Ambulatory Surgery Ctr., LLC v. State Health Planning & Dev. Agency, 38 So.3d 739, 745 (Ala.Civ.App.2008) (pretermitting other arguments for reversal once dispositive issue decided).

. The fewest, number of beds that may be converted to establish an LTACH is 25. Ala. Admin. Code (SHPDA), Rule 410-2-4-,02(8)(d).